David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway, 18th Floor
New York, New York 10006
(212) 338-9100

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GREGORY CLEMENS,

                            Plaintiff,

    -against-                               **COMPLAINT**

MOODY'S ANALYTICS, INC.,
                                        (Jury Trial Demanded)
                      Defendant.
-----------------------------------------------------------------x

        Plaintiff, Gregory Clemens, by his attorneys Kaiser Saurborn & Mair, P.C., as and for his complaint against defendant, alleges as follows:

### PARTIES AND VENUE

        1.     Plaintiff, Gregory Clemens, is a resident of the County, City and State of New York.

        2.     Defendant, Moody's Analytics, Inc. ("MAI"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the County, City and State of New York.

        3.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that one of the claims asserted herein arises under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").

        4.     Venue is properly laid in this District pursuant to 28 U.S.C. § 1391, in that it is the

District in which the defendant resides and the District in which a substantial portion of the events giving rise to the claims asserted herein occurred.

## INTRODUCTION

5.  Plaintiff, Gregory Clemens, was a member of MAI's highly successful stress-testing sales and development team when he was diagnosed with colon cancer in 2015. As a result of the cancer and complications resulting from surgery, Clemens took two FMLA leaves totaling approximately two months during 2015. At the end of the 2015 sales year, Mr. Clemens' manager improperly reduced the commissions Clemens' had earned under MAI's non-discretionary commission plan, candidly admitting to Clemens that he was doing so to avoid criticism from his own managers that the commissions Clemens had earned were too high for someone who had been seriously ill and out of the office for two months of medical leave.

6.  Clemens' entitlement to commissions was based, in part, on the tasks he had completed during the plan year. In a transparent attempt to cover up its blatantly discriminatory reduction of Clemens' commissions – and hide the fact that the reduction of Clemens' compensation was undertaken as a direct result of his protected medical leave and disability – MAI launched a purported compliance investigation into Clemens' commissions documentation. Seven weeks later MAI terminated Clemens' employment, falsely claiming he had submitted incorrect information concerning the tasks he had completed during the year and upon which his commissions were based. MAI's assertion was untrue and was used as a pretext by MAI to terminate Clemens' employment and cover up its disability discrimination and FMLA retaliation.

7.  This Action seeks damages for MAI's (a) violations of the federal Family and Medical Leave Act ("FMLA"); (b) disability discrimination in violation of the New York City

Human Rights Law; (c) failure to pay wages in violation of the New York Labor Law; and (d) contractual breach of its commission plan.

### FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

**A.   Clemens' Record of Accomplishment at MAI**

8.   Clemens has over 30 years of experience as a technology executive and management consultant, primarily in the Financial Services industry, including extensive banking systems development experience. He has spent the last fifteen years working in Risk Management, including Credit Risk and Stress Testing.

9.   In August 2013 Clemens was recruited and hired into MAI's newly-formed three-member stress testing team to develop MAI's stress testing business. MAI had fallen far behind its competitors in the stress testing business and the team had been formed to help boost sales and steer product development in this area. Clemens brought technology infrastructure expertise to the team. He and the other members of his team reported to David Little, Managing Director, Specialists and Stress Testing (Americas).

10.   The stress testing team was highly successful in building MAI's stress testing business, growing the business from less than $6 million in 2012 to over $47 million in 2015. At the conclusion of the 2015 sales year (which ended at the end of January 2016) the team had exceeded its $31 million sales target by nearly $17 million. Although credit for sales was not individually allocated within the team in 2015, Clemens was instrumental in the team's sales success despite the serious medical issues he faced that year and the two month's of medical leave he was forced to take.

**B.     Clemens' Medical Leave and His Marginalization by his Manager Upon His Return**

11.     In April 2015 Clemens was diagnosed with colon cancer and spent two periods out of the office on medical leave for two surgeries in mid-2015. After returning, Clemens was marginalized by his manager, David Little, and was not allowed to resume work in his original position as a fully integrated member of the team.

12.     The first surgery in May resulted in Clemens being out on medical leave for three weeks. When he returned to work on June 8, 2015, Clemens provided MAI with a letter from his doctor stating that he was cleared to return without any restrictions or limitations. However, Little refused to allow him to travel to meet with clients as he and the other team members had always done. In addition, when the entire team traveled to San Francisco at the end of June for its periodic meeting with the product development team, Little insisted that Clemens remain in New York and dial in using telephone and Webex.

13.     At the end of July Clemens was hospitalized for a week in order to undergo treatment for an infection resulting from the surgery. He used vacation days for this medical leave but worked extensively while in the hospital including attending conference calls.

14.     At the end of July, Clemens qualified for MA's 2015 "Aaa Club," a prestigious and sought-after award that is given annually to MA's top performers who achieve over 125% of their target sales for the 12-month period ending on July 31 of a calendar year.

15.     From October 13, 2015 through November 22, 2015, Clemens took a second FMLA medical leave for a follow-up surgery and certain complications resulting from the surgery. Upon his return to work, he again provided MAI with a letter from his doctor stating that he was cleared to return to work without any restrictions or limitations.

4

16.     However, Little again insisted that Clemens not travel and instead work on a number of internal projects that Little claimed were important. Little stressed that, because the team had already far exceeded its sales target for the year, Clemens need not worry about meeting with clients. Notwithstanding that Clemens asked to be allowed to travel to clients on a number of occasions, Little continued to insist throughout December 2015 and January 2016 that Clemens not travel to see clients and instead focus on the internal tasks Little had assigned him.

C.    **MAI's Improper Refusal to Pay Clemens the Commissions he Earned for the 2015 Sales Year**

(1)    **The 2015 Commission Plan**

17.     Clemens and the other members of the stress testing team were entitled to receive non-discretionary commission payments under the company's incentive compensation plan. Clemens' 2015 Incentive Compensation Schedule and Agreement ("2015 Commission Plan") provided that his annual target commission payment was $100,000. The plan further provided a table from which his actual commission entitlement would be calculated based on two factors: (a) the number of "contribution units" generated by him for work tasks he performed; and (b) the total sales produced by his team.

18.     The 2015 Commission Plan contained a table describing the number of contribution units to which Clemens was entitled for completing certain defined work tasks. This guidance was supplemented by other written internal guidance that clarified how to record contribution units and the allocation of units for tasks not specifically listed in the 2015 Commission Plan.

### (2) MAI's Initial Determination of Clemens' Commissions

19.     Clemens recorded 164 contribution units for work he had actually performed during the 2015 Commission Plan year. As with previous years, Clemens was always conservative in the number of contribution units he recorded for a specific task.

20.     Prior to the commencement of Clemens' first period of FMLA and disability leave in 2015, he was told by Jason Kofman, MAI's Head of Sales Operations, that it was the policy of the sales division to decide on a case-by-case basis whether or not to prorate commission payments based on medical leave and that they would make a decision in the coming months concerning his case. Thereafter, in February 2016, Clemens was informed by Nancy Morales in Sales Analytics that the decision had been made to prorate his 2015 commissions as a result of his FMLA and disability leave.

21.     Later that month Clemens received a full-year written commission summary ("2015 Commission Summary") showing the calculation of the 2015 commissions he had earned. A portion of the commissions had been paid during the 2015 plan year and the balance was due to be paid at the end of March 2016.

22.     Under the calculation contained in the 2015 Commission Summary, MAI reduced Clemens' commissions by almost $16,000 in a lump-sum adjustment to his commissions which was labeled "LOA adj - 63 days." No calculation was provided to support the amount of the adjustment, but upon information and belief the deduction was made because Clemens had taken approved FMLA leave.

23.     The 2015 Commission Summary showed that, after the reduction for his FMLA leave, Clemens was entitled to a commission payment of $186,056.

24.     Had Clemens not been penalized with the lump-sum adjustment for his approved FMLA leave, he would have been entitled to 2015 commissions of at least $201,807 under the terms of the 2015 Commission Plan.

### (3)    Clemens' Manager Improperly and Arbitrarily Reduced His Contribution Units and Thereby Cut His Commissions in Half

25.     On March 15, 2016, Clemens met with Little. Although Little was usually very articulate, calm and rational, on this occasion he seemed extremely agitated and during much of the meeting his statements were almost incomprehensible. Little told Clemens that Little's managers, Robert King, Global Head of Sales, and David Place, Head of Sales for North America, would be unable to accept that Clemens could have met his commissions target given the amount of time he was absent on medical leave and that, consequently, Little would not allow him to keep all of the contribution units he had earned as a result of the tasks he had performed. Throughout the meeting Little seemed preoccupied by a concern that if he allowed Clemens to retain all of the units he had earned, Little's managers would view his actions unfavorably and it would have negative repercussions for him personally.

26.     Little ended the meeting by telling Clemens that he was reducing his contribution units by 20 units, thereby lowering his total units for the year to 144. However, other than a baseless and unsupported claim that Clemens had spent too much time on one presentation (for which Clemens conservatively recorded only 5 units), Little provided no explanation whatsoever as to which tasks accounted for the 20 contribution units he improperly and arbitrarily disallowed.

27.     Two weeks later, Clemens was paid a reduced fourth-quarter commission

payment that brought his total annual 2015 commission payments to $90,730, less than half of the commissions calculated in MAI's internal system before his contribution units were arbitrarily cut in retaliation for his protected medical leave. Notably, however, the commission summary contained in MAI's online system was never amended and continued to reflect that he was entitled to $186,056 of annual commissions, i.e. his full 2015 commission less the lump-sum adjustment because of his medical leave.

### D. MAI's Concocted Compliance Investigation and Termination of Clemens' Employment Based on False and Baseless Allegations

28. On May 20, 2016, Clemens was asked to attend a meeting with members of MAI's compliance group. The meeting, which lasted for approximately an hour, focused entirely on issues related to Clemens' contribution units for the 2015 plan year. After many questions about MAI's contribution unit system in general (with which the compliance employees did not appear familiar), Clemens was asked questions about a number of his specific entries in the system dating back to February 2015, including the time, place, attendees and other details of meetings that had taken place more than a year previously.

29. Clemens told the compliance employees that he was having difficulty remembering the details of these entries without using his diary and computer. He therefore requested that he be allowed to go back to his desk to get these items to provide more detailed and accurate answers. The compliance employees did not permit him to do so, claiming that this was not necessary and that he should simply answer their questions to the best of his ability from memory.

30. Although the compliance employees did not request additional information,

following the meeting Clemens sent them documents showing the deliverables he had produced with respect to the specific entries they had questioned him on. They never asked any further questions of Clemens and never provided him an opportunity to provide fuller responses to their questions with the benefit of his computer and calendar as he had requested.

31.     On May 31, 2016, Clemens was abruptly summoned to a meeting with Little and Lauren Rieders from MAI's Human Resources department. Rieders informed him that he was immediately being placed on administrative leave pending the outcome of the ongoing contribution units investigation. She then escorted him to his desk to retrieve only his keys and other personal effects before escorting him from the building.

32.     At that point it became clear to Clemens that the investigation was a sham and was being used as a pretext to try to justify Little's improper reduction of his contribution units as a result of his disability and medical leave. Clemens therefore informed Rieders that he believed he was being subjected to disability discrimination.

33.     On June 8, 2016, Dana Weinshank, a VP of Human Resources, called Clemens and asked him to elaborate on the allegation he had made to Rieders regarding disability discrimination. During that conversation and a subsequent conversation a few days later Clemens described Little's refusal to permit him to continue performing the full duties of his position following his return from medical leave, including Little's refusal to permit him to travel.

34.     On July 8, 2016, Clemens received a call from Weinshank and Little during which he was informed that his employment was being terminated, effective immediately. Weinshank stated that they reviewed his discrimination complaint and found no evidence of discrimination

based on his disability. Little then informed him that the compliance investigation had supposedly concluded that he falsified entries concerning his contribution for three specific tasks. However, this assertion was baseless because Clemens accurately recorded his contributions for all three tasks. In any event, the sum total of all of the units recorded by Clemens for the three tasks cited by Little was only nine units, less than half of the 20 units arbitrarily stripped by Little back in March as a result of his protected disability leave.

**FIRST CAUSE OF ACTION**
(New York Labor Law § 191 *et seq.*)

35. Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "34" as if repeated and incorporated herein.

36. The written terms of the 2015 Commission Plan provide that Clemens was entitled to contribution units for the work he actually performed. As set forth above, Clemens accrued 164 units for the work he actually performed during the portion of the year he was not on medical leave.

37. Little's decision to arbitrarily strip 20 of these units – and therefore confiscate more than half of Clemens' earned commissions – violated New York Labor Law, § 191, which requires that employers have a written agreement concerning the method of calculation of commissions and pay its employees pursuant to the terms of the written agreement.

38. MAI's additional lump-sum reduction of Clemens' commissions because of his approved FMLA leave also violated New York Labor Law, § 191.

39. Had MAI performed the commissions calculation using all 164 contribution units Clemens had earned, and without any reduction because of the approved FMLA leave he had

taken, Clemens would have been entitled to 2015 commissions of at least $201,807. Instead, MAI improperly reduced his 2015 commissions to $90,730, thereby underpaying him by at least $111,077.

40. MAI's refusal to pay Clemens the commission and/or wages he was owed was not undertaken with a good faith belief that its actions complied with the law and/or was willful.

41. By reason thereof, MAI has violated New York Labor Law §191 *et seq.* and Clemens is entitled to recover the total amount of the unpaid commissions and/or wages he was due together with an additional one hundred percent of the total amount due as liquidated damages.

## SECOND CAUSE OF ACTION
(Breach of Contract)

42. Pursuant to Fed. R. Civ. P. 10©, plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "40" as if repeated and incorporated herein.

43. By reason thereof, MAI has breached the 2015 Commission Plan thereby entitling Clemens to recover the total amount of the unpaid commissions he was contractually due

## THIRD CAUSE OF ACTION
(FMLA)

44. Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "40" as if repeated and incorporated herein.

45. MAI improperly reduced Clemens' commissions by making a lump-sum adjustment because he exercised his rights under the FMLA to take protected medical leave.

46. Little also improperly reduced Clemens' contribution units – and therefore the

commissions paid to him by MAI – because Clemens exercised his rights under the FMLA to take protected medical leave.

47. The baseless nature of the allegations made against Clemens regarding his contribution units, coupled with the failure of the investigators to permit Clemens to provide a full explanation for the entries he made, demonstrate that the investigation – and resulting termination of Clemens' employment – were undertaken in an attempt to justify the improper removal of the 20 contribution units and hide MAI's discriminatory and retaliatory reason for the removal of the units.

48. The false and concocted results of MAI's purported investigation, and MAI's termination of Clemens' employment based on these false and concocted results, were undertaken as a direct result of his protected FMLA leave.

49. MAI has violated the FMLA by discriminating and/or retaliating against Clemens because of his exercise of his rights under the FMLA, including but not limited to (a) reducing Clemens' earned commissions; and (b) terminating Clemens' employment.

50. By reason thereof, Clemens has suffered damages in an amount to be proven at trial, including but not limited to back pay and front pay damages.

51. MAI's reduction of Clemens' commissions and termination of Clemens' employment were not undertaken in good faith and MAI had no reasonable grounds for believing its conduct was lawful under the FMLA.

## FOURTH CAUSE OF ACTION
(NYC Human Rights Law)

52. Pursuant to Fed. R. Civ. P. 10©, plaintiff repeats and realleges each and every

allegation contained in paragraphs "1" through "50" as if repeated and incorporated herein.

53.     Clemens' colon cancer and related medical complications constitute a disability pursuant to New York City Administrative Code § 8-102(16).

54.     The medical leave taken by Clemens in 2015 constituted a reasonable accommodation for a disability pursuant to New York City Administrative Code § 8-102(18).

55.     The reason for MAI's reduction of Clemens' earned commissions was that he had taken medial leave as an accommodation for his disability. The commission reduction therefore constituted discrimination and/or retaliation against Clemens because of his exercise of his right to a reasonable accommodation.

56.     MAI terminated Clemens' employment in an attempt to hide and cover up the unlawful reason behind its reduction of his commissions and in an attempt to falsely establish a legitimate non-discriminatory reason for the deductions. Hence, MAI's termination of Clemens' employment was itself an act of discrimination and/or retaliation against Clemens because of his exercise of his right to a reasonable accommodation.

57.     By reason thereof, MAI has violated New York City Administrative Code §§ 8-107 et seq., and has thereby caused plaintiff to suffer damages, including but not limited to economic injuries, lost employment opportunities and emotional injuries.

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)     On his first cause of action, awarding unpaid wages and/or commissions in an amount to be determined at trial but not less than $111,077 together with liquidated damages equal to an additional one hundred percent of said amount;

(ii)    On his second cause of action, awarding damages in an amount to be determined

at trial but not less than $111,077;

(iii)   On his third cause of action, awarding damages, including but not limited to back pay and front pay damages, in an amount to be proven at trial but not less than $750,000 together with liquidated damages equal to an additional one hundred percent of said amount;

(iv)   On his fourth cause of action, awarding economic damages, including but not limited to back pay and front pay damages, and emotional distress damages in an amount to be proven at trial but not less than $750,000 together with punitive damages in an amount to be determined at trial;

(v)   Awarding plaintiff interest on the foregoing amounts;

(vi)   Awarding plaintiff his attorneys fees and costs incurred in this action pursuant to NY Labor Law § 198, 29 U.S.C. § 2617(a)(3) and New York City Administrative Code § 8-502; and

(viii)   For such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

Dated: New York, New York
January 19, 2017

                                                                        KAISER SAURBORN & MAIR, P.C.
                                                                        Attorneys for plaintiff

By: _____
                                                            David N. Mair [DM-8883]
                                                            111 Broadway, 18th Floor
                                                            New York, New York 10006
                                                            (212) 338-9100