USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
GREGORY CLEMENS,

           *Plaintiff*,

           -against-

MOODY'S ANALYTICS, INC.,

           *Defendant*.
------------------------------------------------------------- x

17-cv-410 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiff Gregory Clemens brings this action against Defendant Moody's Analytics, Inc., his former employer, alleging that Moody's improperly reduced his compensation and terminated his employment. He brings claims under: (1) the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); (2) the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"); (3) breach of contract; and (4) the New York Labor Law § 191 *et seq.* ("NYLL"). Defendant's summary judgment motion is GRANTED.

## BACKGROUND

    Plaintiff joined Moody's as a Solutions Specialist in the Company's Stress Testing Team in August 2013. Pl.'s 56.1, Dkt. 36, ¶ 1. As a Solutions Specialist, Plaintiff primarily assisted Moody's sales team by providing subject matter guidance on various subjects and products relating to stress testing for banks, financial services, and other companies. *Id.* Plaintiff reported at all times to David Little, Managing Director and Head of the Stress Testing Team. *Id.* ¶ 3. In April 2015, Anna Krayn became Team Lead for the Stress Testing Team. *Id.* ¶ 4.

    In addition to receiving an annual salary of $175,000, Plaintiff was eligible to receive additional compensation under the terms of the applicable incentive plan. *Id.* ¶ 2. During the

relevant time period, different Moody's employees were covered by different incentive compensation plans. *Id.* ¶ 6. Plaintiff participated in Moody's 2015 Incentive Compensation Plan ("2015 Plan" or "Plan"). *Id.* ¶ 5. The 2015 Plan year ran from February 1, 2015 through January 31, 2016. *Id.* Under the version of the Plan applicable to Plaintiff, he was eligible to receive incentive payments based on his individual performance and the overall performance of the Stress Testing Team, which was measured against an annual sales target. *Id.* ¶ 6.

Plaintiff's individual performance under the Plan was measured based on completing enumerated activities. *Id.* ¶ 7. These enumerated activities allowed an employee to claim contribution unit credits that varied depending on the nature of the activity and the employee's expected and actual time commitment. *Id.* ¶ 8. Under the Plan, Plaintiff was eligible to receive 100% of his targeted incentive payout if he recorded 160 or more contribution units and the Stress Testing Team met its annual sales target. *Id.* ¶ 9. The Plan states that "contribution units generated by the associate during the commission period [are] subject to manager review." Burns Decl. Ex. 8 (2015 Plan) at 1. It further states that "Moody's reserves the right to periodically review the plan, and, if necessary, adjust the incentives and objectives, in its sole and absolute discretion," and "amend or terminate the Plan at any time, without notice, in its sole and absolute discretion." *Id.* at 4.

During the 2015 Plan year, Plaintiff recorded his contribution units using Moody's Salesforce program. Pl.'s 56.1 ¶ 10. Salesforce allows users to enter key data points to track contribution unit activities, such as the type of activity and relevant client contact. *Id.* Consistent with the Plan's terms, Little reviewed the Stress Testing Team's activity and conducted an annual year-end review of the contribution units claimed by each team member.

2

*Id.* ¶ 17. As Team Lead, Krayn also reviewed the Salesforce entries for each member of the Stress Testing Team after the close of the 2015 Plan year. *Id.*

On May 14, 2015, Plaintiff began a paid leave of absence following his diagnosis with colon cancer. *Id.* ¶ 18. Plaintiff was out of the office on leave until June 5, 2015. *Id.* At the direction of Plaintiff's physician, Moody's permitted Plaintiff to work from home several days a week through July 10, 2015. *Id.* ¶ 19. Plaintiff began a second leave from October 13, 2015 through November 23, 2015, in connection with a second surgery related to his colon cancer. *Id.* ¶ 20. In total, Plaintiff was on medical leave for 63 days in 2015. *Id.* ¶ 23. In February 2016, Moody's prorated Plaintiff's year-end 2015 incentive compensation based on the number of days he was out of the office on leave. *Id.* ¶ 37.

In February and March 2016, both Little and Krayn identified a number of Plaintiff's specific contribution unit entries that raised red flags. *Id.* ¶ 38. It appeared that Plaintiff had claimed contribution unit credit multiple times for each of two internal projects: a review of competitors Oracle and SAS, and a review of an accounting standard referred to as "CECL." *Id.* ¶¶ 39-41. These entries represented nearly 20% of the 164 contribution units that Plaintiff claimed in 2015. *Id.* ¶ 42. Without these entries, Plaintiff would not have reached 160 contribution units and would not be eligible for 100% of his target incentive compensation. *Id.* ¶ 51. Little and Krayn also flagged certain face-to-face client meetings that Plaintiff claimed for contribution unit but which could not be substantiated through expense reports, Salesforce, or other sources. *Id.* ¶ 44.

On March 14, 2016, Little met with Plaintiff and told him that he was taking away 20 of his contribution units. *Id.* ¶ 47. Little also told Plaintiff that he was surprised by the number of contribution units he had claimed, given the length of time he was out of the office in 2015. *Id.*

¶ 49. After meeting with Plaintiff and getting approval from Robert King, Moody's Global Head of Sales, Little removed 20 of the 30 contribution units claimed by Plaintiff for the Oracle/SAS and CECL projects. *Id.* ¶¶ 27, 46. Little also removed an additional 3 contribution units, which corresponded to the number of units that Plaintiff recorded for a sales pitch to a client. *Id.* ¶¶ 43, 50. These adjustments lowered Plaintiff's total contribution units for 2015 from 164 to 141. *Id.* ¶ 51. As a result, Plaintiff earned 80% instead of 100% of his targeted incentive compensation and was disqualified from receiving an "over target" payout. *Id.*

Little also contacted Moody's Human Resources in March 2016 to discuss Plaintiffs' contribution units. *Id.* ¶ 55. Human Resources transmitted Little's allegations to Moody's Compliance Department. *Id.* ¶¶ 55, 57. According to a Compliance intake form, Little alleged that Plaintiff may have falsified Salesforce records in order to receive an increased commission payout of approximately $100,000. *Id.* ¶ 58.

Based on this information, Compliance initiated an investigation into Plaintiff's Salesforce entries. *Id.* ¶ 57. The investigation was conducted by two attorneys within the Compliance Department. *Id.* ¶ 59. As part of the investigation, the investigators interviewed Plaintiff, Little, Krayn, and Charlotte Liu, the Director of Business Analytics responsible for managing Moody's Salesforce program. *Id.* ¶ 60. The investigators also interviewed several members of Moody's sales team in connection with specific client meetings for which Plaintiff had claimed contribution unit credit. *Id.* In addition, the investigators reviewed Plaintiff's Salesforce records, Outlook Calendar, and detailed work notebook. *Id.* The investigation resulted in a final Compliance Report, which stated that "it appears that [Plaintiff] entered false or inaccurate entries into Salesforce," which "in their totality . . . violate Moody's Business Code of Conduct." *Id.* ¶¶ 62-63. The Code of Conduct provides that "[a]ny employee who creates . . .

misleading or falsified records will be subject to disciplinary action up to and including termination." *Id.*

The Compliance Report was reviewed by Moody's Investigation Review Committee ("IRC") in accordance with Moody's policy. *Id.* ¶ 85. The IRC is comprised of members of Moody's Compliance and Legal Departments, none of whom had supervisory authority over Plaintiff. *Id.* ¶ 86. On or about July 7, 2016, following a review of the Compliance Report, the IRC determined that Plaintiff had violated the Code of Conduct and recommended terminating Plaintiff's employment. *Id.* ¶ 87; Curran Decl. ¶¶ 1-3. After conferring with King, Little informed Plaintiff that he was being terminated. Pl.'s 56.1 ¶ 87. Plaintiff initiated this suit on January 19, 2017. *See* Compl., Dkt. 1.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Thus, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (citation and alteration omitted). "Even where facts are disputed, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e).

## ANALYSIS

### I. FMLA Claims

Plaintiff alleges that Defendant unlawfully retaliated against him for exercising his right to take medical leave under the FMLA. To succeed on this retaliation claim, Plaintiff must first establish a *prima facie* case: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). "If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, clear, specific and nondiscriminatory reason for its actions." *Kim v. Goldberg, Weprin, Finkel Godstein, LLP*, 862 F. Supp. 2d 311, 318 (S.D.N.Y. 2012). If Defendant satisfies that burden, the burden shifts to Plaintiff to "establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for retaliation." *Id.* (citation and alteration omitted).

6

Plaintiff identifies two adverse employment actions: (1) the reduction of his compensation through Little's removal of his contribution units; and (2) the termination of his employment. Compl. ¶¶ 44-51; Pl.'s Mem. in Opp'n, Dkt. 35, at 18. Defendant concedes that Plaintiff exercised rights under the FMLA, was qualified for his position, and suffered these adverse employment actions. Defendant contends, however, that Plaintiff cannot meet his burden of establishing a *prima facie* case because he fails to establish that these adverse employment actions occurred under circumstances giving rise to an inference of retaliatory intent. Def.'s Mem. in Support, Dkt. 23, at 12.

A plaintiff can establish an inference of retaliatory intent: (1) "directly through a showing of evidence of retaliatory animus toward plaintiff by defendant;" (2) "indirectly through a showing that the protected activity was followed closely by discriminatory treatment, commonly known as 'temporal proximity;'" or (3) "indirectly through other evidence such as disparate treatment of similarly-situated employees." *Alexander v. Bd. of Educ. of City Sch. Dist. of City of New York*, 107 F. Supp. 3d 323, 328 (citations omitted). A review of the evidence shows that Plaintiff has not satisfied his burden on this element of his *prima facie* case.

First, Plaintiff has failed to present any direct evidence of retaliatory animus. Even "isolated and stray remarks, without more, are insufficient to raise an inference of retaliation," *id.* at 330, and here, there are *no* remarks by anybody at Moody's suggesting that they disapproved of Plaintiff's FMLA leave. Plaintiff admits that Little did not voice any objections to Plaintiffs' two requests for FMLA leave and that nobody at Moody's made any derogatory or negative comments about his FMLA leaves. Pl.'s 56.1 ¶¶ 25-26. To the contrary, Plaintiff admits that Little and King were supportive—perhaps over-supportive—of Plaintiff's accommodation and needs during his leaves. *Id.* ¶ 27. In fact, Plaintiff expressed his appreciation for their support in

7

an e-mail to King following his first leave: "I am also very grateful for how Moody's, and in particular, you, David [Little] and the management team accommodated me during my cancer surgery and recovery this summer." Burns Decl. Ex. 14 (8/18/15 e-mail from Plaintiff). Plaintiff also returned to his same position after his leave, which further "counters any inference of discrimination." *See Alexander*, 107 F. Supp. 3d at 330.

After his return, Plaintiff claims that Little denied him the ability to go on business trips. Pl.'s 56.1 ¶¶ 29-33. But this is not evidence of retaliatory animus. Rather, Plaintiff admitted that these were instances where Little was "too supportive" by telling him that he should not travel even though his doctor had authorized him to do so. Pl. Dep. Tr. 49:15–50:3. Plaintiff also points to the undisputed fact that Little mentioned that he was surprised by how many contribution units he claimed because of his FMLA leave. But this comment suggests only that Little was skeptical of how much work Plaintiff claimed he performed given that he missed 63 days of work—not that Little disapproved of Plaintiff taking FMLA leave. *See De Oliveira v. Cairo-Durham Cent. Sch. Dist.*, No. 11-cv-393, 2014 WL 4900403, at *21 (N.D.N.Y. Sept. 30, 2014), *aff'd in relevant part*, 634 Fed. App'x 320 (2d Cir. 2016) ("Superintendent Sharkey's single comment that '[t]hose 24 days got you' regarding the impact of plaintiff's days of unpaid leave on her seniority is factually correct and insufficient to show retaliatory intent."). Thus, there is no direct evidence of retaliatory animus.

Second, Plaintiff fails to show temporal proximity between the FMLA leaves and the adverse actions. "[D]istrict courts within the Second Circuit have consistently held that the passage of more than two to three months between the protected activity and the adverse employment action militates against an inference of causation." *Kim*, 862 F. Supp. 2d at 319 (citing *Kamrowski v. Morrison Mgmt. Specialist*, No. 05-cv-9234, 2010 WL 3932354, at *22

8

(S.D.N.Y. Sept. 29, 2010) (collecting cases)). Nearly four months passed between the end of Plaintiff's second leave on November 23, 2015 and the reduction of his contribution units in March 2016. *See* Pl.'s 56.1 ¶¶ 20, 46-47. Over seven months passed before his termination on July 8, 2016. *Id.* ¶¶ 46-47, 87. Thus, temporal proximity does not support an inference of causation.

Third, Plaintiff fails to show an inference indirectly through other evidence such as disparate treatment of similarly situated employees. To show disparate treatment, "[i]n addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff." *Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012). Plaintiff is unable to point to a single similarly-situated Moody's employee who did not take FMLA leave and who was not disciplined after being found to have entered Salesforce entries in the manner that Plaintiff did. *See id.* at 103 (finding that plaintiff failed to establish *prima facie* case where she "has not alleged that any of her co-workers engaged in the same conduct as she did and were treated more favorably").

Plaintiff argues that two other employees similarly recorded multiple sets of units for projects that took longer than the amount of time allotted. Pl.'s Mem. in Opp'n at 12. But these two employees, Aubrey Clayton and Tim Kong, are not similarly situated to Plaintiff. They were not part of the Stress Testing Team and were subject to a different incentive plan in a different year. Unlike the 2015 Plan that applied to Plaintiff, the 2013 Plan that applied to Clayton and Kong specifically permitted them to claim a specified number of contribution units "per day" of work towards a project. *Compare* Burns Decl. Ex. 8 (Pl.'s 2015 Plan), *with* Tang Decl. Exs. 1-2 (Clayton and Kong 2013 Plans).

9

Plaintiff also points to Krayn's testimony and contends that she "admitted that she may have made multiple contribution unit entries for her duties as editor of the internal Risk Perspectives Magazine with respect to a single edition." Pl.'s Mem. in Opp'n at 12. Plaintiff, however, mischaracterizes Krayn's testimony. She testified that if she ever claimed multiple contribution units for work related to the same edition of the magazine, it would only be in the event that she claimed contribution units for contributing content to the magazine, which is an activity that is separate from her duties as editor and would be considered a different project. *See* Krayn Dep. 50:6–51:24. In sum, there is no evidence of disparate treatment or other indirect evidence of retaliatory intent, and Plaintiff has not made a *prima facie* showing.

Even assuming that Plaintiff met his burden to establish a *prima facie* case, Defendant has "articulated a legitimate, clear, specific and nondiscriminatory reason for its actions," and Plaintiff cannot "establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for retaliation." *See Kim*, 862 F. Supp. 2d at 318. Defendant contends that it reduced Plaintiff's compensation and terminated his employment because Plaintiff falsely claimed credit for specific work activities to inflate his incentive compensation. An investigation initiated by its Human Resources Department and conducted by its Compliance Department confirmed that Plaintiff claimed contribution units for projects and client meetings that could not be substantiated, and he claimed multiple sets of contribution units for the same internal projects. Then, Moody's IRC reviewed the results of the investigation and recommended terminating his employment. *See* Def.'s Mem. in Opp'n at 1. Defendant has also submitted evidence substantiating that this investigation occurred and made the findings alleged. *See* Def.'s 56.1, Dkt. 24, ¶¶ 55-87. This is sufficient to satisfy Defendant's burden and shift the burden back to Plaintiff to prove that Defendant's stated reason for its decision to terminate Plaintiff's

employment and reduce his compensation was pretextual. *See Alexander*, 107 F. Supp. 3d at 326-327, 332 (holding that defendant made an adequate showing of a legitimate nondiscriminatory reason for terminating Plaintiff by providing evidence that an internal investigation recommended disciplinary action).

Plaintiff attempts to satisfy his burden by trying to trash the integrity of the compliance investigation. Indeed, because "it is not the function of a fact-finder to second-guess business decisions," Plaintiff cannot prove pretext merely by showing that the investigation's findings were inaccurate. *Dearden v. GlaxoSmithKline LLC*, No. 15-cv-7628, 2017 WL 4084049, at *11 (S.D.N.Y. Sept. 14, 2017) (citation omitted); *see also McPherson v. New York City Dep't of Educ.*, 457 F.3d 211 (2d Cir. 2006) ("We are interested in what 'motivated the employer'; the factual validity of the underlying imputation against the employee is not at issue." (internal citations omitted)). Rather, Plaintiff can prevail only if he "has shown evidence that the decision is so lacking in merit as to call into question its genuineness." *Dearden*, 2017 WL 4084049, at *11 (quotations omitted). Plaintiff contends that the decision was not genuine because Little "repeatedly lied to the investigators in order to orchestrate an outcome to the investigation that supported his improper removal of [Plaintiff's] units," and then he used the outcome as a pretext to terminate Plaintiff "in order to cover up his initial unlawful retaliation." Pl.'s Mem. in Opp'n at 1. The evidence, however, does not support Plaintiff's theory that Little was out to get him.

Plaintiff contends that Little convinced the investigators that Plaintiff's entries were improper by lying to the investigators about how the 2015 Plan functioned. Pl.'s Mem. in Opp'n at 10-12. The 2015 Plan contains a table describing the tasks that one can enter in Salesforce and listing the number of contribution units that may be claimed for each task. *See* Burns Decl. Ex. 8. For example, the value of the task "Workshop, Training, Roundtable, Speaking Engagement"

is listed as 5 contribution units, and the description states that it "[r]epresents up to one week of preparation, planning, & completion of a formal in-person training session, workshop, panel discussion, or speaking engagement, to which you made a significant contribution." *Id.* Little claims that it was improper for Plaintiff to record more than one entry of contribution units relating to a single project regardless of how many weeks of effort he spent on the project. Def.'s Resp. to Pl.'s 56.1 ¶ 124. Little also claims he had never approved this practice for any of the members of his team. *Id.* Plaintiff contends that Little's claims are false and that it was appropriate for him to record multiple entries if he spent multiple weeks working on the same project. Pl.'s Mem. in Opp'n at 11.

Even if Little is incorrect, however, there is no evidence that Little intentionally lied to the investigators. For example, Plaintiff claims that Little conceded that Plaintiff's interpretation was correct in an e-mail to one of the investigators. *Id.* at 11-12. Plaintiff, however, mischaracterizes the e-mail, in which Little states that "claiming 15 points for each presentation would indicate that [Plaintiff] spent over 120 hours on each." Mair Decl. Ex. 16 (5/4/16 e-mail from Little). Little's e-mail suggests only that, even under Plaintiff's interpretation of the 2015 Plan, Plaintiff was representing that he spent 120 hours of work for one presentation. Elsewhere, Little explained to the investigators that he simply did not believe it was credible that Plaintiff worked that many hours. *See* Burns Decl. Ex. 21 (Compliance Report) at 7 ("[Little] noted that the project should have taken approximately 10 hours."). Moreover, Plaintiff's argument on this point is internally inconsistent: if Little were trying to convince the investigators that Plaintiff could not claim multiple sets of units, he would not send an e-mail *to one of the investigators* conceding that Plaintiff could claim multiple sets of units.

Plaintiff also mischaracterizes Krayn's testimony as suggesting that it was common for an employee to record multiple entries so long as the employee had "a conversation with [his or her] manager." Pl.'s Mem. in Opp'n at 12. Krayn actually testified that she "can't imagine" a situation where such conduct would be appropriate unless that employee had "an explicit discussion with a manager." Krayn Dep. Tr. 54:14-19. Indeed, Plaintiff's theory that Little intentionally lied to the investigators about the proper interpretation of the 2015 Plan fails to explain the undisputed fact that Krayn independently flagged Plaintiff's Saleforce entries as suspicious, suggesting that she shared Little's interpretation even before the compliance investigation. *See* Pl.'s 56.1 ¶ 38. In fact, no witness besides Plaintiff has testified in support of Plaintiff's interpretation. *Id.* ¶ 13. Plaintiff's theory that Little was motivated to "cover up" his action of removing Plaintiff's units is similarly implausible in light of the undisputed fact that Plaintiff did not tell anyone at Moody's that he believed the reduction in his units was retaliatory until after Little reported Plaintiff's actions to Human Resources and Plaintiff was placed on administrative leave pending the outcome of the compliance investigation. *Id.* ¶ 52, 122. Thus, Little had nothing to "cover up" at the time he contacted Human Resources.

In short, Plaintiff fails to prove by a preponderance of evidence that Little repeatedly lied to investigators in order to orchestrate the outcome of the investigation. As such, even assuming Plaintiff established a *prima facie* case, he fails to show that Defendant's stated reason for its actions was a pretext. Because Plaintiff's evidence would not allow a reasonable jury to find for him on his FMLA retaliation claim, Defendant is entitled to summary judgment on this claim.

Aside from his retaliation claim, Plaintiff separately claims that Defendant violated the FMLA by prorating his commissions in February 2016. Pl.'s Mem. in Opp'n at 20. He argues that this interfered with his exercise of his FMLA rights. *See* 29 U.S.C. § 2615(a)(1). The very

case that Plaintiff cites, however, holds that employers are permitted to prorate incentive bonuses such as Plaintiff's. *See Sommer v. The Vanguard Grp.*, 461 F. 3d 397, 401 (3d Cir. 2006) ("[The] employer may prorate any production bonuses to be paid to an FMLA leave taker by the amount of lost production (be it hours or another quantifiable measure of productivity) caused by the FMLA leave."). It is undisputed that Plaintiff's incentive compensation was based on both his own personal production and the production of the Stress Testing Team overall, and that Plaintiff did not contribute to the Stress Testing Team's production during his leaves. Pl.'s 56.1 ¶¶ 6, 9; Burns Decl. Ex. 19 (3/16/16 e-mail from Plaintiff) ("HR was very clear that one cannot work during a disability leave . . . ."). Hence, Defendant did not violate the FMLA by prorating Plaintiff's incentive compensation to account for this lost production. *See Sommer*, 461 F.3d at 405 ("[W]e hold that the hours-based Vanguard Partnership Plan is a bonus program designed to award employee production, which may be prorated to account for the hours not worked by those employees who take FMLA leave."). Plaintiff's FMLA interference claim fails as a matter of law, and Defendant is entitled to summary judgment on this claim.

## II. NYCHRL Claims

Plaintiff alleges that Defendant's actions "constituted discrimination and/or retaliation" under the NYCHRL. Compl. ¶¶ 55-57. Regardless of whether Plaintiff alleges a discrimination claim or a retaliation claim, Plaintiff cannot prevail under either theory.

To prevail on a retaliation claim under NYCHRL, Plaintiff must show: (1) "that [he] took an action opposing [his] employer's discrimination"; and (2) "that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mereigh v. New York & Presbyterian Hosp.*, No. 16-5583, 2017 WL 5195236, at *6 (S.D.N.Y. Nov. 9, 2017) (citation and internal quotation marks omitted). Plaintiff's claim fails at the first

14

step because the only action he identifies is his act of taking FMLA leave, *see* Compl. ¶¶ 52-57, and taking FMLA leave is not an action opposing his employer's discrimination. *See Stuart v. T-Mobile USA, Inc.*, No. 14-cv-4252, 2015 WL 4760184, at *11 (S.D.N.Y. Aug. 12, 2015) (holding that "being disabled" and "taking time off under the FMLA" is not "protected activity under the NYCHRL").

To prevail on a claim for discrimination under the NYCHRL, Plaintiff must show that "he has been treated less well at least in part 'because of' his protected status." *McDonnell v. Schindler Elevator Corp.*, No. 12-cv-4614, 2014 WL 3512772, at *16 (S.D.N.Y. July 16, 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (citations and alterations omitted)). Plaintiff fails to satisfy his burden because there is no evidence of discriminatory animus based on Plaintiff's disability or medical leaves. Instead, the evidence shows that Moody's granted multiple requests for accommodation, that nobody at Moody's made any negative remarks about his disability or leaves, and that Plaintiff's team supported him while he was on leave and when he returned to work. Pl.'s 56.1 ¶¶ 25-28. Hence, Plaintiff's NYCHRL discrimination claim also fails. *See Rozenfeld v. Dep't of Design & Constr. of the City of N.Y.*, 875 F. Supp. 2d 189, 205-06 (E.D.N.Y. 2012) (granting summary judgment on federal and NYCHRL claims where "Plaintiff explicitly states nobody made disparaging comments about his [protected class]"). Accordingly, Defendant is entitled to summary judgment on these claims.

### III. Breach of Contract Claim

Plaintiff argues that the 2015 Plan constituted a contract between the parties, and that Defendant breached that contract when Little removed 20 contribution units that he had properly earned under the terms of the Plan. Pl.'s Mem. in Opp'n at 22. Plaintiff concedes that the Plan

15

provided that Defendant could "adjust the incentives and objectives" and "amend or terminate the Plan" in its "sole and absolute discretion." *Id.* Nevertheless, he maintains that the Plan only allows Defendant to take such actions prospectively, and that he had already earned his compensation before Defendant improperly removed his units. *Id.* at 22-23.

Nothing in the Plan, however, states that Defendant may take such actions only prospectively, or before an employee claims contribution units. To the contrary, the Plan expressly states that contribution units are "subject to manager review," suggesting that the Plan may be altered even after units are claimed. *See* Burns Decl. Ex. 8 at 1. Moreover, it is highly doubtful that Plaintiff was entitled to the 20 units under the terms of the Plan, given that the Compliance Report found that Plaintiff made false entries. In any event, even assuming that Plaintiff properly earned the 20 units, the fact that the Plan grants Defendant the "sole and absolute discretion" to adjust, amend, or terminate the Plan renders the Plan unenforceable. *See O'Grady v. BlueCrest Capital Mgmt. LLP*, 111 F. Supp. 494, 501 (S.D.N.Y. 2015) ("It is well established that an employee cannot recover for an employer's failure to pay a bonus under a plan that provides the employer with absolute discretion in deciding whether to pay the bonus." (citation omitted)); *Kavitz v. Int'l Bus. Machines Corp.*, No. 09-cv-5710, 2010 WL 11507447, at *6-7 (S.D.N.Y. Aug. 27, 2010), *aff'd* 458 Fed. App'x 18 (2d Cir. 2012) (holding that incentive compensation plan did not constitute enforceable contract where plan gave employer the right to adjust or cancel the plan "at any time during the Plan period up until any related payments have been earned under its terms"). Thus, Plaintiff's breach of contract claim fails as a matter of law, and Defendant is entitled to summary judgment.

**IV. NYLL Claim**

Lastly, Plaintiff claims that Defendant unlawfully withheld wages under NYLL § 191 by reducing his contribution units and prorating his incentive compensation. Compl. ¶¶ 35-41. This claim fails as a matter of law because the incentive compensation offered under the Plan does not qualify as "wages" covered by the NYLL.

"The New York Labor Law applies to the payment of wages." *Quirk v. Am. Mgmt. Sys., Inc.*, No. 01-cv-6813, 2002 WL 31654966, at *2 (S.D.N.Y. Nov. 22, 2002). "Under New York law, incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage." *Tischmann v. ITT/Sheraton Corp.*, 882 F. Supp. 1358, 1370 (S.D.N.Y. 1995). Hence, incentive compensation does not constitute "wages" where it is based on a combination of individual performance and group performance or where the employer retains discretion not to pay the incentive compensation. *See Quirk*, 2002 WL 31654966, at *2 (granting summary judgment to employer where employee's incentive compensation was based on a combination of individual and group performance and where employer retained discretion over incentive compensation); *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 514 (S.D.N.Y. 1997) (holding that bonus did not constitute "wages" where "[i]t does not appear, from the terms of the [plan], or the testimony before this Court, that the award of the bonus was based on Suwyn's own performance, or that the actual payment of a bonus was guaranteed as a term of employment."). Plaintiff does not dispute that his incentive compensation was based on a combination of his individual performance and the overall performance of the Stress Testing Team. *See* Pl.'s 56.1 ¶ 6. In addition, as explained above, Defendant retained "sole and absolute discretion" to alter, amend, or terminate the Plan. *See*

Burns Decl. Ex. 8 at 4. Therefore, Plaintiff was not deprived of "wages" and Defendant is entitled to summary judgment on his NYLL claim.

## **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

Dated: New York, New York
      April 9, 2018

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge